IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL BECKINGER, ADAM )
BLAKE, DAVID KERESTES, PAUL )
SAXON, JUSTIN WARDMAN, )          CIVIL ACTION NO.  08-432
 )
Plaintiffs, )
 )
v. )
 )
TOWNSHIP OF ELIZABETH, )
DONALD SIMILO Commissioner, )
JOANNE BECKOWITZ Commissioner, )
ROBERT THOMAS Commissioner, )
HELEN KOCHAN Commissioner, )
EDWARD GRONLUND Commissioner, )
ROBERT H. KEEFER Commissioner, )
LARRY VOTA Commissioner, CHIEF OF )
POLICE ROBERT W. MCNEILLY, )
SERGEANT WILLIAM K. BLACK, )
individually and in their capacity )
 )
Defendants. )

MEMORANDUM OPINION

CONTI, District Judge.


I.      **Introduction**

        Pending before the court is a motion for summary judgment (Docket No. 34) filed by

defendants Township of Elizabeth (the "Township"), Robert W. McNeilly ("McNeilly"), and

William K. Black ("Black") in their individual and official capacities (collectively,

 "defendants"), with respect to the remaining claims asserted in the first amended complaint

("Am. Compl.") (Docket No. 10) by plaintiffs Michael Beckinger ("Beckinger"), Adam Blake

("Blake"), David Kerestes ("Kerestes"), Paul Saxon ("Saxon"), and Justin Wardman

("Wardman" and together with Beckinger, Blake, Kerestes and Saxon, the "plaintiffs").  The remaining claims[1] are asserted in count I against the Township and McNeilly and Black in their individual capacities, pursuant to 42 U.S.C. § 1983 for retaliation and prior restraint in violation of the First Amendment to the United States Constitution; in count V against McNeilly and Black under Pennsylvania law for intentional infliction of emotional distress ("IIED"); and in count VI against McNeilly under Pennsylvania law for slander per se.

## II.    Procedural Background

On or about February 12, 2008, plaintiffs commenced this action by writ of summons in the Court of Common Pleas of Allegheny County, Pennsylvania and on March 1, 2008, filed a complaint.  On March 31, 2008, defendants removed the action to this federal court.  (Docket No. 1.)  On April 7, 2008, defendants filed a motion to dismiss the complaint.  (Docket No. 2.)

On May 19, 2008, plaintiffs filed a first amended complaint, asserting the following claims[2]:

---

[1]  Claims previously dismissed include: claims asserted under 42 U.S.C. § 1983 for violations of plaintiffs' procedural and substantive rights under the Fourteenth Amendment to the United States Constitution at count I and violations of plaintiffs' equal protection rights under the Fourteenth Amendment at count II; claims asserted under Pennsylvania's Whistle Blower Act, 43 PA. CONS. STAT. 1423 at count III; and claims asserted under Pennsylvania law for breach of contract at count IV, for IIED against the Township and the remaining defendants in their official capacities at count V, for slander per se against the Township and Black at count VI, and for civil conspiracy at count VII.  See Hr'g Tr. 25-32, July 28, 2008 (Docket No. 22); see also Hr'g Tr. 28-33, Mar. 6, 2009 (Docket No. 42.).

Plaintiffs withdrew and the court dismissed all claims against each of the individual commissioners, as well as all relief requested for punitive damages against the Township.  See Hr'g Tr. 25, July 28, 2008.

[2]  The description of plaintiffs' claims reflects the court's understanding based upon its reading of the complaint, which in many instances stated the same claim under different counts.

Count I – pursuant to 42 U.S.C. § 1983 for violation of plaintiffs' rights to freedom of speech and retaliation under the First Amendment to the United States Constitution against the Township, McNeilly and Black; and for violation of plaintiffs' procedural and substantive rights under the Fourteenth Amendment to the United States Constitution against the Township, McNeilly and Black.

Count II – pursuant to 42 U.S.C. § 1983 for violation of plaintiffs' rights to equal protection under the Fourteen Amendment against the Township, McNeilly and Black;

Count III – under 43 PA. CONS. STAT. 1423, commonly referred to as the Pennsylvania Whistle Blower Act, against the Township, McNeilly and Black;

Count IV – breach of contract under Pennsylvania law against the Township;

Count V – IIED under Pennsylvania law, against the Township, McNeilly and Black;

Count VI – slander per se under Pennsylvania law against the Township, McNeilly and Black; and

Count VII – civil conspiracy under Pennsylvania law against the Township, Donald Similo, Joanne Beckowitz, Robert Thomas, Helen Kochan, Edward Gronlund, Robert K. Keefer, Larry Vota, and McNeilly.

On June 9, 2008, defendants filed a motion to dismiss plaintiffs' amended complaint. (Docket No. 13.)  On June 30, 2008, defendants filed a supplemental motion to dismiss the amended complaint.  (Docket No. 18.)  On July 28, 2008, the court dismissed all claims asserted in counts II, IV, and VII, plaintiffs' substantive due process claims asserted in count I, and all claims asserted against the individual commissioners, Donald Similo, Joanne Beckowitz, Robert Thomas, Helen Kochan, Edward Gronlund, Robert K. Keefer, and Larry Vota.  See Hr'g Tr. 25-32, Jul. 28, 2008.  The court ordered plaintiffs and defendants to further brief the first amendment claims and the procedural due process claims at count I and plaintiffs to brief the state law claims not addressed in their original response.  (Id. at 32-33.)

3

On January 12, 2009, the court noted that no procedural due process claims remained. See Hr'g Tr. 5-6, Jan. 12, 2009. The court ordered the parties to brief the issues related to qualified immunity in light of the opinion in Reilly v. City of Atlantic City, 532 F.3d 216, 221 (3d Cir. 2008), issued by the Court of Appeals for the Third Circuit subsequent to the date of the allegations made by plaintiffs in the amended complaint. See Hr'g Tr. 8-10, Jan. 12, 2009. The court also ordered the parties to brief all the remaining issues in the current briefs. (Id.)

On March 6, 2009, the court granted in part and denied in part defendants' motions to dismiss plaintiffs' amended complaint. See Hr'g Tr. 28-33, Mar. 6, 2009. The court dismissed without prejudice the claims in count III, for violations of the Pennsylvania Whistleblower Act; in count V, for IIED against the Township and the remaining defendants in their official capacities, and in count VI, for slander per se against Black and the Township. Id.

On March 11, 2009, the court directed the parties after conducting fact discovery to file a motion for summary judgment limited to the issues of qualified immunity and high public official immunity.

### III.    Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

4

Defendants filed a statement of undisputed material facts (the "S.F.") (Docket No. 36.). Plaintiffs failed to respond to defendants' statement of undisputed material facts. Therefore, all facts set forth therein are deemed admitted and material pursuant to Local Rule 56.1E.[3]

A.    **Relationship of the Parties**

During the relevant time period, the Township employed approximately fourteen police officers, including the five plaintiffs. (Am. Compl. ¶¶ 17-21; Answer ¶¶ 2, 12; S.F. ¶¶ 9, 45.) McNeilly was employed by the Township as the police chief (Am. Compl. ¶ 24; Answer ¶ 2) and Black was employed by the Township as the administrative sergeant. (Am. Compl. ¶ 15; Answer ¶ 10.)

B.    **Background**

In early 2007, the chief of police, McNeilly, and the administrative sergeant, Black, discussed a number of problems associated with the use of Township parking tags to cite vehicle owners in violation of the Townships's parking ordinance. (S.F. ¶ 1.) The parking tags contained an incorrect address for the police station and instructed the recipient to place $5.00 in a designated envelope and place the envelope into a nonexistent box outside the police station. (Id. ¶ 2.) There were no follow-up procedures to ensure that the citations were paid and no procedures for the handling, recording and tracking of cash payments received. (Id. ¶ 3.)

---

[3]    Local Rule 56E.1 provides:

> **Admission of Material Facts**. Alleged material facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be disputed, will for purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

McNeilly and Black concluded that officers should temporarily issue state traffic citations to address parking violations until the problems could be resolved.  (Id. ¶ 4.)

On January 16, 2007, Black issued an administrative sergeant memorandum No. 07-06 ("Memo 07-06"), instructing officers to cease using the local citation tags for violations of the Township's parking ordinance and to start using state traffic citations.  (Id. ¶ 5.)  The memorandum provided:

> ADMINISTRATIVE SERGEANT MEMO 07-06
>
> Effective immediately, officers will not use the dated "Police Notice for Parking Violation" tag.  The format, to include the department address, is dated.  Until further notice, officers will issue state Traffic Citations.

(Memo 07-06; S.F. Ex.1A) (Docket No. 36-2.)  Memo 07-06 noted administrative problems and reminded officers that it may be necessary to knock on residents' doors prior to issuing a citation to determine whether a vehicle in question was connected to that address and actually in violation of the ordinance.  (S.F. ¶¶ 6,7.)

> Currently, there is no efficient means to track the old Parking tag. A tag may be issued, but the department has not pursued those that have not been paid, which would result in a state citation.  Some have been paid, logged in a book and retained.  Others come in to the station to complain about receiving a parking tag, give a reasonable excuse and either leave here feeling worse than when they walked in or managing to explain their way out of the tag.
>
> In order to be fair to all concerned, state tags will be issued and any person who wishes to contest the citation will be directed to do so by requesting a hearing in front of the magistrate.
>
> Officers are reminded that it may be necessary, in some circumstances, to knock on a residents [sic] door to clarify that a vehicle or vehicles in violation are actually connected with that resident, prior to issuing a citation.

6

(Memo 07-06; S.F. Ex. 1A.)  Memo 07-06 did not instruct officers to increase the number of parking citations they otherwise would have issued.  (S.F. ¶ 8.)

From January 15, 2007 through January 22, 2007, approximately seventy-five parking citations were issued to Township residents by six of the Township's fourteen police officers, including Beckinger, Saxon, and Wardman.  (Id. ¶ 9.)  Plaintiffs allege that the tickets were issued at the request of the Township's road department out of concern with snow removal.  In 2006, the police department issued a total of seven parking citations.  (Id. ¶ 10.)  In 2005, the police department issued a total of nineteen citations.  (Id. ¶ 11.)  The Township's parking ordinance prohibits parking on the street when parking off the street is available.  (Id. ¶ 12.)  The ordinance provides:

> **¶409.  Parking on Street Prohibited in Certain Circumstances Where Off-Street Parking is Available.**
>
> Where off-street parking is available, parking is prohibited on the traveled portion of any street or highway in a residential district where a clear and obstructed width of not less than twenty feet (20) upon the main traveled portion of the said street of highway shall be left free for the passage of other vehicles therein. (Ord. 561, 6/1/1987)

(Elizabeth Twp. Ordinance 561, § 409 (June 1, 1987); S.F. Ex.1B; S.F. ¶12.)

In order to determine whether a violation of the ordinance occurred, a police officer needed to conduct a simple investigation prior to issuing a citation.  (S.F. ¶14.)

> [T]he way the ordinance reads, if at all possible, [a vehicle] has to be parked in the driveway; but there are times when there may be reasons it's not or there might be extenuating circumstances.  You don't know, for example, that there was a visiting nurse, just went in, and parked the car on the street to go in and attend to somebody who is getting hospice.

7

(McNeilly Dep. 42, June 9, 2009; S.F. Ex. 2).

The practice of the Township's police department when an officer received a complaint with respect to an on-street parking issue was for the officer to knock on the door of the residence with which the officer believed the vehicle was associated and inquire about whether the vehicle was associated with the resident and, if so, the reason the vehicle was parked on the street.  (S.F. ¶ 13.)  In the event the police officer determined that the vehicle was parked in violation of the ordinance, the practice was to direct the owner to move the vehicle, as opposed to issuing a citation.  (Id. ¶ 15.)

On January 22, 2007, McNeilly issued a memorandum to each of the officers who had written parking citations in the previous week stating his concern about the sudden increase in the enforcement of the Township's parking ordinance and directing the officers to respond to a list of questions relating to the circumstances under which the parking citations were issued.  (Id. ¶ 16.)

Chief's Memo 07-20

It has come to my attention that some officers have recently begun issuing many parking citations throughout the Township.  This dramatic increase in citations over a one-week period of time far surpasses the citations written to residents for on-street parking over a period of many years.
. . .

In an effort to understand the sudden increase in enforcement of the Township Ordinance I will need you to answer the following.

1.  What prompted your sudden increase in writing on-street parking citations?
2.  Did anyone provide you with instructions to increase parking citations?

8

3.  Did emergency conditions exist in citing vehicles for parking over the past week?
4.  Did you advise any vehicle owners to move their cars before citing?
5.  If so, did any of the vehicle owners move their vehicles rather than being cited?
6.  If so, approximately how many?
7.  Did any residents refuse to move their vehicles?
8.  Did any of the vehicle owners or residents discuss with you their receiving the citation?
9. If so, what did you relate to the vehicle owner and/or resident?

You will need to prepare a memo in order to relate the information concerning the listed questions. . .

(Chief's Mem. 7-20 to Saxon; S.F. Ex. 1C.)[4]  Saxon, Beckinger and Wardman each reported that

---

[4]  On January 23, 2007, the McKeesport, Pennsylvania newspaper, *The Daily News* published an article referencing complaints raised by two Township residents at a board of commissioners' meeting and reported comments made by McNeilly as follows: "Something out of the ordinary happened to prompt that," McNeilly said.. . . "I don't think it was fair, the way the people were treated," McNeilly said.. . . "I'm going to be addressing this immediately," he promised.  "I'm going to write some memos to the officers asking them to answer what prompted all these citations to be written recently."  (Raymond Pefferman, *Police Chief Investigating What Caused Rash of Parking Citations in Eliz. Twp*., THE DAILY NEWS, Jan. 23, 2007 at 6; S.F. Ex. 3; S.F. ¶¶ 21, 23.)  The article stated that McNeilly expressed surprise that the residents were not given a warning prior to being cited, and stated that he would put a policy in place that is "very explicit" with respect to how to respond to such ordinance violations.  (Id.; S.F. ¶ 24.)  McNeilly declined to identify the officers involved.  (Id.; S.F. ¶ 25.)

On February 6, 2007, the Pittsburgh Pennsylvania newspaper, the PITTSBURGH TRIBUNE-REVIEW, published an article about the high number of parking citations issued by the five officers during the week of January 15 through January 22, 2007.  (Carl Prine, *Elizabeth Twp. Parking Tiff centers on McNeilly,* PITTSBURGH TRIBUNE-REVIEW, Feb. 6, 2007; S.F. Ex. 5: S.F. ¶ 37.)  The article reference Memo 07-06 and reported that McNeilly "never through they'd [sic] write that many tickets" and ordered officers to knock on doors prior to issuing a ticket to provide residents an opportunity to move their vehicles. (Id.; S.F. ¶¶ 39-40.)  The article also reported that on January 22, 20007, McNeilly stated at a public Township meeting that he vowed to probe the surge in citations and to resolve the issue with a magistrate judge (the "MDJ").  (Id.; S.F. ¶ 41.)  The article state that McNeilly turned over the citations to the MDJ after conferring with the district attorney.  (Id.; S.F. ¶ 42.)  According to the article, McNeilly intended to attend the hearing himself, but indicated that if the court issued subpoenas ordering the officers to appear in court, they would go.  (Id.; S.F. ¶ 43.)  The article did not identify the officers by name.

he did not attempt to contact the vehicles' owners prior to issuing citations.  (S.F ¶¶ 17-20.)

Saxon stated:

> I did not make contact with any of the vehicle owners prior to
> issuing the parking citations.  I did not make the attempt to notify
> the vehicle owners due to the time of day in which I found the
> violations, and also the ordinance does not require that we attempt
> to notify the owner prior to issuing a parking tag/traffic citation.

(Saxon Mem., Jan. 24, 2007; S.F. Ex.1D.)  Wardman stated:  "I did not attempt to contact the

owners of any of the vehicles that were issued citations, nor did I advise any vehicle owners to

move their vehicles. . .."  (Wardman Mem., Jan. 24, 2007; S.F. Ex.1D.)

Beckinger stated:

> There was no need to knock on the residents [sic] door that had
> sufficient space in their driveways.  There was no need to knock on
> the residents [sic] door, during the early morning hours, to
> investigate further.  All violators had adequate room in driveways
> to park their vehicles.

(Beckinger Mem., Jan. 23, 2007; S.F. Ex. 1, D.)

On January 30, 2007, Black, directed by McNeilly, issued administrative sergeant

memorandum number 07-17 ("Memo 07-17"), directing any officer who received notice from the

magistrate's office regarding hearings on parking ordinance violations not to attend the hearing

and informing the officers that no overtime would be paid for any officer's attendance at the

hearings.  (S.F ¶ 36.)  Memo 07-17 provided:

_____

(Id.; S.F. 44¶.)

ADMINISTRATIVE SERGEANT MEMO 07-17

> Any officer that receives a notice from the magistrates [sic] office, regarding hearings set for "Township Ordinance - Parking Violations" or "Any State Parking Violations", [sic] shall not attend those hearings.  No overtime will be authorized for officers to attend these type [of] hearings.

(Memo 07-17; S.F. Ex.1F.)

On or about January 31, 2007, a magisterial district judge issued hearing notices - "Notice of Trial / Summary Case" - to the recipients of the parking citations, setting forth their rights and obligations.  (S.F. Ex. 4; S.F ¶¶ 29, 31, 32.)  Copies of the notices were sent to the officers who issued the citations.  The notices did not order the officers to attend the hearings.  (S.F. Ex. 4; S.F ¶¶ 30, 32.)  Plaintiffs characterize the notices as subpoenas.  Defendants, however, deny that the notices were subpoenas.  (Am. Compl. ¶ 60; Answer ¶ 31.)

On February 27, 2007, Saxon attended a parking citation hearing, contrary to the directive set forth in the Memo 07-17 and submitted a request for overtime pay for his attendance. (McNeilly Aff., S.F. Ex. 1, ¶ 51; S.F. ¶ 48.)  On February 28, 2007, McNeilly issued a memorandum to Saxon requesting a written explanation of his noncompliance with the directive issued by Black in Memo 07-17.  (McNeilly Mem. 07-51; Ex. 10; S.F. ¶ 50.)

Chief's Memo 07-51

> The Department Directives notice board contains a Department Directive issued by Sgt. William K. Black (Administrative Sergeant Memo 07-17) dated January 30, 2007.  That directive instructs, '[sic] Any officer that receives a notice from the magistrate's office, regarding hearings set for "[sic] Township ordinance – Parking Violations' or 'Any State Parking Violations', [sic] shall not attend those hearings.  No overtime will be authorized for officers to attend these type hearings."

11

>Sgt. Black sent the memo to every officer through the department
>e-mail system.
>
>On Wednesday, February 28, 2007, I received a Court Attendance
>Voucher from you for a hearing at the District Justice office.  You
>listed an appearance from 0915 to 1015 hours on February 27, 2007
>. . . .
>
>You will need to complete a memo to me with the following
>information.
>
>  ‣ The reason you attended the district justice hearing.
>  ‣ Your knowledge of Administration Sergeant Memo 07-17.
>  ‣ The name of any supervisor who authorized your attendance at the
>    district justice hearing.
>  ‣ The name of any supervisor you may have informed that you intended
>    to attend a district justice hearing for a parking citation. . . .

(McNeilly Mem. 07-51; S.F. Ex. 10; S.F. ¶ 50.)

On March 1, 2007, Saxon received a three-day suspension for disobedience of orders,
conduct unbecoming an officer, and insubordination, which was upheld by the board of
commissioners, and by a neutral arbitrator in a grievance proceeding initiated by Saxon.  (S.F. ¶¶
51-52; S.F. Ex. 1 ¶ 55; Elizabeth Twp. Disciplinary Action Report DAR # 07-01; S.F. Ex.12.)
Saxon was paid overtime for his attendance at the hearing on February 27, 2007, in accordance
with the terms of a collective bargaining agreement.  (S.F. ¶ 53; S.F. Ex. 1 ¶ 52.)

Beckinger and Wardman followed the directive set forth in Memo 07-17 and did not
attend the hearings related to the parking citations they issued, even though they received hearing
notices.  (S.F. ¶ 49.)  Kerestes and Blake did not issue any parking citations between January 15
and 22, 2007, and neither received any hearing notices relating to parking citations issued
between those dates.  (S.F. ¶¶ 54-57; S.F. Exs. 8, 9.)  Kerestes and Blake admitted that Memo

07-17 did not prevent Kerestes or Blake from attending or testifying at any hearing that they would have attended or  testified at in the absence of Memo 07-17.  (S.F. Exs. 8, 9; S.F. ¶ 58.)

Saxon, Beckinger, Kerestes, Blake and Wardman[5] admitted in discovery that complaints raised at a public meeting by Township residents concerning actions taken by Township police officers acting in their official capacities are a matter of public concern.  (S.F. Ex. 6, 7, 8, 9; S.F. ¶ 26.)[6]  Saxon and Beckinger also admitted in discovery that plaintiffs are public figures when acting in their official capacities as police officers for the Township.  (S.F. Exs. 6-7; S.F. ¶ 46.) Saxon admitted that all parking citations issued by him between January 15 and 22, 2007 were issued in his official capacity as a police officer of the Township.  (S.F. Ex. 6; S.F. ¶ 47.)


IV.     **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

---

[5]     Counsel for defendants served upon plaintiffs' counsel requests for admission directed to each plaintiff.  Defendants' counsel were served responses by Saxon, Beckinger, Blake and Kerestes, but not by Wardman.  No extension of time to respond was communicated to defendants' counsel.  Pursuant to Federal Rule of Civil Procedure 36(a)(3), all the requests set forth in defendants' requests for admission directed to Wardman are deemed admitted.

[6] The statements in the newspaper article, purportedly made by McNeilly, were made at a public meeting and related to complaints made by Township residents with respect to the issuance of parking citations made by Township police officers.  (S.F ¶¶ 27, 28; S.F. Exs. 3, 4, 6, 7, 8, 9.)

13

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'"  Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson, 477 U.S. at 248.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D. N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

V.    **Discussion**

During the course of this litigation, plaintiffs' claims and the pool of defendants were considerably narrowed.  Plaintiffs' remaining claims are federal claims asserted pursuant to 42

14

U.S.C. § 1983 ("§ 1983 ") for retaliation and prior restraint in violation of the First Amendment,

and state claims for slander per se and IIED under Pennsylvania law.[7]

**A.     Section 1983 Claims**

      **1.)     General Framework**

Section 1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.  For purposes of this section, any Act of Congress
> applicable exclusively to the District of Columbia shall be
> considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  This statute does not create substantive rights.  Maher v. Gagne, 448 U.S.

122, 129 n.11 (1980).  A plaintiff cannot prevail in an action brought under § 1983 without

establishing an underlying violation of a federally protected right.  Collins v. Harker Heights, 503

U.S. 115, 119-20 (1992).  "Section 1983 itself 'contains no state-of-mind requirement

independent of that necessary to state a violation' of the underlying federal right." Bd. of County

Comm'rs v. Brown, 520 U.S. 397, 405 (1997) (quoting Daniels v. Williams, 474 U.S. 327, 330

---

[7]     The court indicated at the hearing on July 28, 2008, that, in the event plaintiffs'
federal claims do not survive, the court would dismiss plaintiffs' state claims and remand the
case back to state court.  (See Hrg. Tr. 31-32, Jul. 28, 2008.)

(1986)).

### 2.)   Underlying Federal Right – First Amendment Rights

The federal rights asserted in this case arise under the First Amendment which provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

Plaintiffs' claims against the Township, McNeilly and Black  implicate retaliation and prior restraint.

### a)   Public Employee's Speech and Retaliation

### (1)   Decisions prior to 2006

In a distinct line of decisions, the Supreme Court has delineated the scope of a public employee's right under the Free Speech Clause to speak without fear of retaliation by his or her employer.  For decades, it was generally accepted that the Constitution did not impose limits on a public employer's ability to condition public employment on a public employee's willingness to refrain from engaging in constitutionally protected activities.  Adler v. Bd. of Educ., 342 U.S. 485, 492 (1952) ("They may work for the school system upon the reasonable terms laid down by the proper authorities of New York.  If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere.").

The Supreme Court in 1968 recognized that public employees do not lose all their rights. The test to be applied in determining the constitutionality of employer discipline in retaliation for speech had its genesis in Pickering v. Board of Education, 391 U.S. 563 (1968).  In Pickering,

16

the Supreme Court explained:

> "The theory that public employment which may be denied altogether may
> be subjected to any conditions, regardless of how unreasonable, has been
> uniformly rejected." *Keyishian v. Board of Regents*, [385 U.S. 589, 605-
> 06 (1967)]. At the same time it cannot be gainsaid that the State has
> interests as an employer in regulating the speech of its employees that
> differ significantly from those it possesses in connection with regulation of
> the speech of the citizenry in general. The problem in any case is to arrive
> at a balance between the interests of the teacher, as a citizen, in
> commenting upon matters of public concern and the interest of the State,
> as an employer, in promoting the efficiency of the public services it
> performs through its employees.

Pickering, 391 U.S. at 568. Given the language in Pickering, it was made clear that a public

employee's right to be free from employer discipline in retaliation for speech protects only his or

her interest in speaking *as a citizen* about *matters of public concern*. Where implicated, it is *this*

interest which must be weighed against the employer's interest in "promoting the efficiency of

the public services it performs through its employees." Id. If a public employee does not speak

*as a citizen* about *matters of public concern*, there is nothing to balance against the competing

interests of the public employer. *Roe*, 543 U.S. at 82 ("Pickering did not hold that any and all

statements by a public employee are entitled to balancing. To require Pickering balancing in

every case where speech by a public employee is at issue, no matter the content of the speech,

could compromise the proper functioning of government offices.").

The constitutionality of employment-related discipline imposed on a public employee in

retaliation for speech is not always examined in accordance with the standards applicable to

speech restrictions imposed by the government on members of the general population. San

Diego v. Roe, 543 U.S. 77, 80 (2004) (observing that a public employer may constitutionally

impose restrictions on the speech of its employees "that would be unconstitutional if applied to

the general public").

The ability to impose certain restrictions is appropriate because "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion); see Connick v. Myers, 461 U.S. 138, 146 (1983) ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."); Pickering, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). The "as a citizen" inquiry presents a mixed question of law and fact. Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007). The "public concern" and "balancing" tests present questions of law for the court to decide. McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005).

### (ii)    Decisions after 2005

In 2006 the Supreme Court recognized in Garcetti v. Ceballos, 547 U.S. 410 (2006), that "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 417.

Approximately two years later, on July 1, 2008, the Court of Appeals for the Third Circuit considered whether testimony in a court by a public employee is protected speech. Reilly v.

18

Atlantic City, 532 F.3d 216, 228 (3d Cir. 2008).  The court of appeals stated that "following

*Garcetti*, [a] public employee's statement is protected activity when (1) in making it, the

employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the

government employer did not have 'an adequate justification for treating the employee differently

from any other member of the general public' as a result of the statement he made [i.e., the

*Pickering* balancing test].") (quoting Hill v. Borough of Kutztown, 445 F.3d 225, 241-42 (3d Cir.

2006) and Garcetti, 547 U.S. at 418).  After analyzing Garcetti, the court of appeals instructed

that the Garcetti decision could not be read so broadly that a public employee could be

disciplined for testimony given in the course of his official duties.

b)      **Prior Restraint**

The threshold issue in determining whether a claim exists for a violation of a right under

the First Amendment is to determine whether the speech at issue is protected.  "Freedom of

speech and expression occupies an exalted niche in the empyrean of personal liberties guaranteed

by the Constitution." Alderman v. Phila. Hous. Auth., 496 F.2d 164, 167 (3d Cir. 1974).

"[C]ourts have remained particularly sensitive to governmental regulation that tends to impinge

on expressive freedom."  Id. at 168.

At the same time, however, government employers must be given sufficient latitude to

regulate employee conduct in order effectively and efficiently to carry out their operations.

> [A]lthough the Court has reiterated on numerous occasions that
> persons in public employment are not constitutionally compelled to
> relinquish the First Amendment rights they would otherwise enjoy
> to comment on matters of public interest, the Court has also
> cautioned that the public employee cannot engage in activity that
> impairs the efficiency of such public service.

19

Trotman v. Bd. of Trs. of Lincoln Univ., 635 F.2d 216, 229 (3d Cir. 1980) (citing Pickering v.

Bd. of Educ., 391 U.S. 563, 568 (1968)).  "The United States Supreme Court has held repeatedly

that an injunction against speech generally will not be considered an unconstitutional prior

restraint if it is issued after a jury has determined that the speech is not constitutionally

protected."  Kramer v. Thompson, 947 F.2d 666, 675-76 (3d Cir. 1991) (citing Pittsburgh Press

Co. v. Pittsburgh Comm'n on Human Rel., 413 U.S. 376, 390 (1973).

       To date, the Court of Appeals for the Third Circuit has not addressed an alleged prior

restraint claim under Garcetti.  The Court of Appeals for the Seventh Circuit did so in

Samuelson v. LaPorte Community School Corp., 526 F.3d 1046, 1051-52 (7th Cir. 2008).  In

Samuelson, the court of appeals concluded that prior restrictions on speech in the context of

public employment situations do not necessarily violate the First Amendment.  The court of

appeals stated:

> The term "prior restraint" is used to describe "administrative and
> judicial orders *forbidding* certain communications when issued in
> advance of the time that such communications are to occur."
> *Alexander v. United States,* 509 U.S. 544, 550,113 S.Ct. 2766, 125
> L.Ed.2d 441 (1993). . . . A restriction is a prior restraint if it meets
> four elements: (1) the speaker must apply to the decision maker
> before engaging in the proposed communication; (2) the decision
> maker is empowered to determine whether the applicant should be
> granted permission on the basis of its review of the content of the
> communication; (3) approval of the application requires the
> decision maker's affirmative action; and (4) approval is not a
> matter of routine, but involves "appraisal of facts, the exercise of
> judgment, and the formation of an opinion" by the decision maker.
> . . .
> [The court] first must determine whether that policy applies to
> speech that is protected by the First Amendment. *See United States
> v. Nat'l Treasury Employees Union,* 513 U.S. 454, 465-66 . . .
> (1995) . . . .  "[W]hen public employees make statements pursuant
> to their official duties, the employees are not speaking as citizens

20

for First Amendment purposes." *Garcetti v. Ceballos,* 547 U.S.
410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

<u>Samuelson</u>. 526 F.3d at 1051-52.

### 3.    Count I : Violations of First Amendment Rights

Plaintiffs claim that defendants deprived them of their First Amendment rights.  Saxon's

First Amendment claim for retaliation is based upon defendants' alleged actions subsequent to

his attendance at the parking violation hearing before a local magistrate judge and is a First

Amendment retaliation claim.  The claims of Beckinger, Blake, Kerestes and Wardman under the

First Amendment are for prior restraints based upon defendants' alleged actions preventing them

from attending the parking violation hearings.  Blake and Kerestes admit that they did not issue

any parking citations during the relevant time period and did not receive any hearing notices.

Plaintiffs argue that the holding in <u>Garcetti</u>, "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First Amendment

purposes, and the Constitution does not insulate their communications from employer

discipline," is irrelevant to the instant case because the court in <u>Garcetti</u> did not specifically

address the First Amendment right to attend court hearings.

Defendants argue that the distinction between plaintiffs' retaliation and prior restraint

First Amendments claims is a distinction without a difference because the right of the officers to

testify in the parking court is not protected speech; defendants assert it is part of their official

duties.  In support, defendants rely upon <u>Wetzel v. Town of Orangetown</u>, No. 06 Civ. 5144, 2007

WL 3009999, at *2 (S.D. N.Y., Oct. 12, 2007) (explaining that "if an employee can be

disciplined, pursuant to *Garcetti*, for speech related to their employment, [then] such speech can

21

also be curtailed before it occurs"); <u>Murray v. Washington State Dep't of Ecology</u>, No. CV-06-142, 2008 WL 467340, at *14 (E.D. Wash., Feb. 19, 2008 ) (where restraint on speech imposed by an employer related solely to speech that the plaintiff would be making pursuant to his official duties, the restraint was constitutional); <u>see</u> <u>Samuelson v. Laporte Cmty. Sch. Corp.</u>, 526 F.3d 1046, 1052 (7th Cir. 2008) (explaining that because speech related to a public employee's professional responsibilities is not protected by the First Amendment, restriction of that expression cannot constitute a prior restraint) (citing <u>Garcetti</u>, 547 U.S. at 424); <u>Kramer v. Thomas</u>, 947 F.2d 666, 675 (3d Cir. 1991) (noting that the Supreme court has repeatedly held that a prohibition against speech is not considered an unconstitutional prior restraint where it has been determined that the prohibited speech is not constitutionally protected).

Defendants argue that even if plaintiffs' rights were violated, they cannot be liable for the alleged violations because they are entitled to qualified immunity.  The motion for summary judgment which is the subject of this opinion with respect to the § 1983 claim addresses only the issue of qualified immunity.  Whether qualified immunity exists will be dispositive of all plaintiffs' First Amendment claims without the need to distinguish between a violation of rights characterized as a prior restraint or a retaliation.

### 4.     Qualified Immunity

The privilege of qualified immunity recognizes the balance between the need for a forum to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening government officials to suit for the discretionary exercise of their public duties.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814 (1982).  The United States Supreme Court resolved these competing concerns "by generally providing government officials performing discretionary

functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).[8]  The privilege affords "protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  When it attaches, the privilege of qualified immunity "is an *immunity from suit* rather than a mere defense to liability" which is lost if defendants are permitted to go to trial.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009); quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)) (qualified immunity is not a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation").  Consequently, the Supreme Court has often stressed the importance of resolving qualified immunity issues at the earliest possible stage in litigation.  Saucier, 533 U.S. at 201 (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

An objective inquiry is required into the reasonableness of the actions of government officials that permits government officials to anticipate when their conduct may give rise to liability for damages.  Anderson, 483 U.S. at 645-66.  Once qualified immunity is asserted by a defendant, the plaintiff has the burden of demonstrating the privilege should not attach. McLaughlin v. Watson, 271 F.3d 566, 570 (3d Cir.  2001).

The Supreme Court has recognized that a court evaluating a defendant's claim of qualified immunity will often find it beneficial to first decide whether the plaintiff can establish

---

[8]      The United States Court of Appeals for the Third Circuit recognized "that there is a compelling need for such protective doctrine because of the severe chilling effect numerous suits for damages would have on prospective officials." Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir. 1994).

an actionable violation of a federally protected right.  Pearson, 129 S. Ct. at 818, 821-22.  The

next question for consideration is whether the right was clearly established at the time of the

violations.  This inquiry "must be undertaken in light of the specific context of the case, not as a

broad general proposition."  Saucier, 533 U.S. at 201.  The critical question is whether it would

have been clear to reasonable officials in a similar position that their conduct was unlawful under

the particular circumstances that they confronted.  Id. at 202;  Anderson, 483 U.S. at 640 (1987)

("[t]he contours of the right must be sufficiently clear that a reasonable official would understand

that what he [or she] is doing violates that right.").   Thus, the standard is objective, viewing the

relevant circumstances from the perspective of an objectively reasonable official.  Showers v.

Spangler, 182 F.3d 165, 171-72 (3d Cir. 1999).  "As the qualified immunity defense has evolved,

it provides ample protection to all but the plainly incompetent or those who knowingly violate

the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

     The court in Saucier set forth an analytical two-prong test to determine whether

defendants are entitled to qualified immunity which is distinct from the inquiry into the merits of

the claim.  Saucier, 533 U.S. at 197.  In Pearson, the Supreme Court overruled Saucier, to the

extent that the two-step procedure represents an inflexible sequential requirement.  Pearson, 129

S. Ct. at 811 (concluding that courts may exercise their sound discretion in deciding which of the

two prongs should be addressed first in light of the circumstances in the particular case at hand).

In the instant case, the court will follow the original sequence set forth in Saucier.

      In the first step, the court is to determine whether the facts, taken in a light most

favorable to plaintiffs' allegations, show that defendants' conduct violated a federal right or

constituted a constitutional violation.  Id. at 201.  In determining this first step, the court should

24

"set forth principles which will become the basis for a holding that a right is clearly established."
Id. If a federal right would be violated based upon a plaintiff's allegations, the second step is for
the court to determine whether the federal right alleged to be violated was clearly established to a
degree of particularity within the specific context of the case at issue. Id. A broad and
generalized declaration that a clearly established federal right was violated is insufficient.
Anderson, 483 U.S. at 640 ("[t]he contours of the right must be sufficiently clear that a
reasonable official would understand that what he [or she] is doing violates that right."). Thus, a
right is "clearly established" where "it would be clear to a reasonable officer that his conduct was
unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The court also considers
"whether  a reasonable government official should have known that the alleged action violated
the plaintiffs' rights." Doe v. County of Centre, Pa, 242 F.3d 437, 454 (3d Cir. 2001).

The Supreme Court of the United States instructs that determining whether a right was
"clearly established depends, in large degree, on the degree of particularity within the specific
context of the case at issue." Saucier, 533 U.S. at 197. The Supreme Court has instructed lower
courts to apply all precedents within their knowledge in deciding the issue of qualified immunity.
Elder v. Holloway, 510 U.S. 510 (1994). "[T]here must be sufficient precedent at the time of
action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her
conduct is constitutionally prohibited." McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir.
2001).

a)      **First Prong - Constitutional Violation**

In Garcetti, the Supreme Court clarified the standard that a court should use to determine
whether speech of a public employee is protected under the First Amendment.  First the court

must determine whether the employee spoke both (1) as a citizen; and (2) on a matter of public concern.  Garcetti, 547 U.S. at 418 (citing Pickering 391 U.S. at 568).  If the answer to either question is no, the employee has no First Amendment claim.  Id.  If the answer to both questions is yes, then the possibility of a First Amendment claim arises.  Id.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.  Id.  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. "  Id.  The Court in Garcetti made clear that speech made "pursuant to official duties" does not warrant the constitutional protection of speech made pursuant to an individual's status "as a citizen."  Id. at 421.

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

Id. at 421-22.

In Reilly, the Court of Appeals for the Third Circuit noted that Garcetti offered "no express instruction on the application of the First Amendment to the trial testimony of a public employee."  Reilly, 532 F.3d at 231.  "The Garcetti opinion focused solely on the speech contained in [the plaintiff's] internal memo, leaving to the court of appeals on remand the opportunity to consider whether [the plaintiff's] conduct at the meeting and his testimony in court were entitled to First Amendment protection.  Id. (citing Garcetti, 547 U.S. at 443-44 (Souter, J., dissenting)).  In Reilly the Court of Appeals considered whether the defendant city officials were entitled to qualified immunity.  In Reilly, a police officer asserted a First

Amendment retaliation claim based upon discipline imposed for the officer's testimony against another officer who was prosecuted due to an investigation of corruption in the Atlantic City Police Department. The district court denied qualified immunity. The decision of the district court, however, was issued two months <u>prior</u> to the Supreme Court's decision in <u>Garcetti</u>. The defendant city officials appealed the denial of qualified immunity.

The court of appeals considered whether <u>Garcetti</u> would necessitate a reversal and the grant of qualified immunity. The court of appeals limited its inquiry to the question whether Reilly spoke as a citizen when he testified at trial. The Court of Appeals for the Third Circuit noted that the right of a public employee was clearly established prior to Garcetti. <u>Id.</u>, at 231.

> When a government employee testifies truthfully, s/he is not "simply performing his or her job duties," <u>Garcetti</u>, 547 U.S. at 423; rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence. Ensuring that truthful testimony is protected by the First Amendment promotes "the individual and societal interests" served when citizens play their vital role in the judicial process. <u>Id.</u> at 420.

<u>Id.</u> (noting that the principles discussed in <u>Garcetti</u> supported the need to protect truthful testimony in court).

At least two district courts in the Third Circuit have discussed the impact of <u>Garcetti</u> post <u>Reilly</u>. In <u>Karchnak v. Swatara Twp.</u>, No. 07-1405, 2009 WL 2139280, at * 14 (M.D. Pa., July 10, 2009), the district court concluded that reach of the "official duties" doctrine set forth in <u>Garcetti</u> was "shortened slightly" by the court of appeals in <u>Reilly</u>. "It is clear from this precedent that where a claimant's speech relates to 'specialized knowledge' or 'experience' acquired through the claimant's job that speech falls within the claimant's official duties, and is thus not protected under *Garcetti*." <u>Id.</u> at *15. "[W]here independent duties compel an

27

employee to speak – such as being called to testify truthfully at trial, – the fact that it is a part of one's job is immaterial" Id. (citing Reilly, 532 F.3d at 231.)  In Knight v. Drye, No. 07-3097, 2009 WL 704140, at *9 (E.D. Pa., Mar. 13, 2009), the district court held that a police officer's complaint to his superior regarding a fellow officer's alleged misconduct did not constitute "citizen speech" under Garcetti, and concluded that the Court of Appeals for the Third Circuit decision in Reilly did not expand the protection of the First Amendment for police officers.

Under Reilly it is clear that the rights asserted by plaintiffs – the right to testify and appear at judicial proceedings to testify – are federally protected under the First Amendment. Thus, plaintiffs can satisfy the first prong of the Saucier test.

      b)      **Second Prong** – **Clearly Established Right to Attend or Testify at a Judicial Proceeding**

          (i)      **Uncertainty following Garcetti**

In Reilly, as previously discussed, the court of appeals recognized that the protected status of courtroom testimony was clearly established prior to Garcetti.  "It is axiomatic that '[e]very citizen ... owes to his society the duty of giving testimony to aid in the enforcement of the law.'" Reilly, 532 F.3d at 228 (citing, inter alia, Piemonte v. United States, 367 U.S. 556, 559 n. 2 (1961); United States v. Mandujano, 425 U.S. 564, 576 (1976);  United States v. Calandra, 414 U.S. 338, 345 (1974); New York v. O'Neill, 359 U.S. 1, 11 (1959).

The court of appeals distinguished Garcetti because the police officer plaintiff in Reilly filed a claim pursuant to 42 U.S.C. § 1983, alleging that his employer violated his First and Fourteenth Amendments by retaliating against him for testimony at trial against another officer who was prosecuted due to an investigation of corruption; whereas, in Garcetti the plaintiff filed

a claim pursuant to 42 U.S.C. § 1983, alleging that his employer violated his First and Fourteenth

Amendments by retaliating against him for writing a memorandum to his supervisors, for his

attendance at a meeting with his supervisors, and for testifying about the memorandum at a

hearing.  Id. at 225 (citing Garcetti, [547 U.S.] at 413-15.)  The court of appeals noted that the

Supreme Court in Garcetti, concluded "the First Amendment does not prohibit managerial

discipline based on an employee's expressions made pursuant to official responsibilities."

> [T]he "controlling factor" was that [the plaintiff] prepared the
> memo "pursuant to his duties as a calendar deputy." . . .  because
> by writing the memo "[the plaintiff] spoke as a prosecutor fulfilling
> a responsibility to advise his supervisor about how best to proceed
> with a pending case...."

Id. at 226 (citing Garcetti, [547 U.S.] at 421-22).

Under those circumstances, the Court in Garcetti held that restricting the speech

contained in the plaintiff's memo did not infringe upon his rights as a citizen.  Id.  The Court

compared the preparation of the memo to the plaintiff's other "daily professional activities, such

as supervising attorneys, investigating charges, and preparing filings," which the plaintiff

performed as an employee.  Id. (citing Garcetti, [547 U.S.] at 422).  The Court distinguished

those tasks from "contributions to the civic discourse," which "retain the prospect of

constitutional protection" for the speaker.  Id.  The court of appeals in Reilly concluded that

> Garcetti simply "narrowed the Court's jurisprudence in the area of
> employee speech" by further restricting the speech activity that is
> protected. Foraker, 501 F.3d at 241. . . . Therefore, the effect of
> Garcetti in the context of this appeal is limited to the question
> whether Reilly spoke as a citizen when he testified at the Munoz trial.

Id. at 228.

29

Notably, the testimony in <u>Reilly</u> involved compelled testimony relating to non-summary criminal charges that occurred <u>prior</u> to the Supreme Court's decision in <u>Garcetti</u>.  The court in <u>Reilly</u> acknowledged that

> we are aware of no precedential appellate decision after <u>Garcetti</u>
> answering the question whether truthful trial testimony arising out
> of the employee's official responsibilities constitutes protected speech.

<u>Id.</u> at 230.

As of the fall of 2007, "the circuit courts that have addressed *Garcetti* in some substance seem[ed] to have been applying *Garcetti* broadly."  Ronald Kramer, <u>Garcetti v. Ceballos: The Battle Over What It Means Has Just Begun</u>, 39 Ubr. Law. 983, 990 (Fall 2007) (citing <u>Green v. v. Barrett</u>, 226 F. App'x 883 (11th Cir. 2007)).  One commentator stated that "[w]hile the dust has yet to settle, the early results indicate that the ultimate impact of *Garcetti* will be litigated long into the future."  39 Urb. Law at 983.  With respect to whether court testimony could be considered an official duty under <u>Garcetti</u>, Justice Souter noted in his dissent in <u>Garcetti</u> that providing truthful testimony "must surely be analyzed independently to protect the integrity of the judicial process."  <u>Id.</u> (quoting <u>Garcetti</u>, 126 S. Ct. at 1973).  The commentatior pointed to a nonprecedential decision of the Court of Appeals for the Eleventh Circuit which held contrary to to Justice Souter's concern.

> In *Green v. Barrett, [*226 F. App'x 883 (11th Cir. 2007)] however,
> the Eleventh Circuit held otherwise.  There, the chief jailor was
> called to testify at an emergency court hearing to determine
> whether a prisoner, a convicted cop killer who had just attempted
> to escape, should be moved to a maximum security prison. [*Id.* At
> 884.] The chief jailor testified to the poor condition of the cells,
> that they could easily be broken out of, and that the jail was unsafe
> to house such an inmate. [*Id.*] The next day she was fired, and she
> brought suit. [*Id.*] The jailor did not dispute that she testified at the
> hearing because she was the chief jailor--the employee responsible

> for the conditions at the jail. [*Id.* at 886] She . . . also did not
> contend that the purpose of her statements was to communicate to
> the public her concerns about the general safety of the jail. [Id.]
> Instead, her statements were made in a hearing conducted for the
> specific purpose of assessing whether the jail was a safe place for a
> specific inmate. [*Id.*] Based on these facts, the court, applying
> *Garcetti*, found that her testimony was given pursuant to her
> official duties as chief jailor and thus was not protected by the First
> Amendment. [*Id.*]

39 Urb. Law at 1006-07.  The court in Green noted that "[t]he key consideration is the purpose

of the communication."  Green, 226 F. App'x at 886 (citing Morris v. Crow, 142 F.3d 1379,

1381 (11th Cir. 1998), which cited Connick v. Myers, 461 U.S.138, 148 n. 8 (1983)).  The Court

of Appeals for the Eleventh Circuit stated:

> If a public employee plaintiff speaks as a citizen with the purpose of
> raising a matter of public concern, then the speech is generally
> protected, subject to some narrow exceptions.. . . However, if a
> plaintiff speaks as part of her duties as a public employee, the speech
> is not protected by the First Amendment.. . .This distinction is not
> affected by the fact that the plaintiff made the statements in
> testimony. *Morris,* 142 F.3d at 1383) ("The mere fact that Morris's
> statements were made in the context of a civil deposition cannot
> transform them into constitutionally protected speech.").

Green, 226 F. App'x at 886.

As evident from Green, with respect to whether an employee has a clearly established

First Amendment  right to attend or testify at judicial proceedings, this court concludes that

Garcetti called into question whether the testimony of a government employee at a judicial

hearing in the course of the employee's duties may constitute speech as a citizen entitled to First

Amendment protection.  This ambiguity after Garcetti lasted until Reilly was decided.  While

Reilly recognized that the right was clearly established prior to Garcetti, it noted that no

precedential opinion was rendered after Garcetti until the court of appeals in Reilly addressed the

issue.  The relevant conduct in <u>Reilly</u> occurred prior to <u>Garcetti</u> at a time when the right was clearly established.  <u>Reilly</u> did not address the situation where the conduct occurred in the period between <u>Garcetti</u> and <u>Reilly</u> when there was uncertainty about how broadly <u>Garcetti</u> would be applied.  As previously noted, the Supreme Court has instructed lower courts to apply all precedents within their knowledge in deciding the issue of qualified immunity.  <u>Elder v. Holloway</u>, 510 U.S. 510 (1994).  "[T]here must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited."  <u>McLaughlin v. Watson</u>, 271 F.3d 566, 572 (3d Cir. 2001).  The court finds that during the small window of time between May 30, 2006 when <u>Garcetti</u> was decided and July 1, 2008 when <u>Reilly</u> was decided, it would not have been clear to a reasonable officer that imposing discipline on a police officer for testifying on matters related to the officer's official duties was unlawful.

(ii) <b>Specific Context of the Instant Action</b>

In the instant action, the court's inquiry turns on the unique timing of the alleged violations of plaintiffs' First Amendment rights.  Here, actions taken by defendants occurred during the period from January through March 2007.  <u>Reilly</u> was decided on July 1, 2008.  From 2006 until that date, a court determining whether an officer's right to attend and testify at the parking hearings was protected by the First Amendment would look to <u>Garcetti</u>, 547 U.S. 410 (2006), for guidance.  <u>Reilly</u> was the first precedential decision after <u>Garcetti</u> by a court of appeals to deal with the rights implicated here.  <u>Reilly</u> clarified the status of the officers' First Amendment rights after <u>Garcetti</u> to attend or testify at judicial proceedings.

Here, plaintiffs issued parking citations pursuant to their official responsibilities as

32

Township police officers.  Any First Amendment activity, including attendance at the hearings

and testimony the officers would have given at the hearings, prior to July 1, 2008 would have

"owed its existence to a public employees' professional responsibilities" and would not have

been known by a reasonable officer to be protected by the Constitution against employer

discipline.  Garcetti 547 U.S. at 417, 422.[9]  During the relevant time period from January through

March 2007, defendant municipal officials reasonably could have believed that under Garcetti

directing the police officers not to attend the parking citation hearings and imposing discipline

for violating that direction did not violate the officers' First Amendment rights.  Cf. Green, 226

F. App'x at 886 (holding that, under Garcetti, testimony given pursuant to the duties of a public

employee is not protected speech).  Under these circumstances, the actions taken by McNeilly

---

[9]  There is no evidence of record which indicates that the officers were compelled to attend the hearings.  The notices issued from the magistrate judge were not directed to the police officers.  The officers were not obligated to attend the parking citation hearings pursuant to any Pennsylvania Rule of Criminal Procedure.  Rule 454(B) of the Pennsylvania Rules of Criminal Procedure provides in relevant part:

> [I]n all summary cases arising under the Vehicle Code or local traffic ordinances, the law enforcement officer observing the defendant's alleged offense may, but shall not be required to, appear and testify against the defendant.  In no event shall the failure of the law enforcement officer to appear, by itself, be a basis for dismissal of the charges against the Defendant.

PA. R. CRIM. P. 454(B); (S.F ¶ 33.)  Rule 457(A) of the Pennsylvania Rules of Criminal Procedure provides:

> In any summary case pending before an issuing authority, at any time before the completion of the summary trial or acceptance of a guilty plea, the issuing authority may permit the affiant, or the affiant's designee, to withdraw one or more of the charges.

PA. R. CRIM. P. 457(A).

and Black with respect to plaintiffs were not objectively unreasonable at the time.  Consequently, McNeilly and Black are entitled to qualified immunity with respect to plaintiffs' claims under the First Amendment and summary judgment must be granted in their favor with respect to plaintiffs' § 1983 claims.

It is axiomatic that if McNeilly and Black are entitled to qualified immunity, the Township likewise cannot be liable for their conduct.  In other words, because McNeilly and Black did not violate clearly established rights, plaintiffs' claims against the Township must fail. See City of Los Angeles v. Heller, 475 U.S. 796, 798-99 (1986) (per curiam) ("neither [Monell] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"); Williams v. Borough of West Chester, 891 F.2d 458, 467 (3d Cir. 1989) ("[A municipality] cannot be vicariously liable under Monell unless one of [the municipality]'s employees is primarily liable under section 1983 itself.").  Under these circumstances, summary judgment must also be granted in favor of the Township.

**B.    Remaining State Claims**

The federal claims in this case are being dismissed.  The other  remaining claims (count V - slander per se and count VI - IIED) arise under Pennsylvania law.    Those state claims are before this court due to supplemental jurisdiction.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").  "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and

34

fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). This court declines to exercise supplementary jurisdiction over the state court claims in this action and they will be remanded to the state court.


VI.   **Conclusion**

After reviewing the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the court concludes that defendants under the doctrine of qualified immunity are immune from suit with respect to the federal claims contained in count I.  Accordingly, the motion for summary judgment filed by defendants will be GRANTED with respect to plaintiffs' federal claims at count I, asserted pursuant to § 1983 for violations of plaintiffs' rights under the First Amendment to the United States Constitution.  All plaintiffs' other claims arising under Pennsylvania law are **REMANDED** to the Court of Common Pleas, Allegheny County, Pennsylvania,  **FORTHWITH**.



Date: March 17, 2010                                    By the court,

                                                        /s/ JOY FLOWERS CONTI
                                                        Joy Flowers Conti
                                                        United States District Judge